**Michael V. DUNLAP, et al., Plaintiffs,**

v.

**UNITED TRANSPORTATION UNION, Defendant.**

**Civ. A. No. 3:92CV83.**

United States District Court,
E.D. Virginia,
Richmond Division.

Oct. 8, 1992.

---

958

Vickey Ann Verwey, David R. Simonsen, Jr., Richmond, VA, for plaintiff.

Jay Joseph Levit, Levit & Mann, Richmond, VA, James Joseph Vergara, Jr., Vergara & Associates, Hopewell, VA, Joseph Guerrieri, Jr., Josh S. Lichtblau, John A. Edmond, Guerrieri, Edmond & James, P.C., Washington, DC, for defendant.

1. On June 3, 1992, the Court granted Michael

## MEMORANDUM OPINION

SPENCER, District Judge.

THIS MATTER is before the Court on Defendant's Motion for Summary Judgment and Plaintiff's Cross Motion for Summary Judgment pursuant to Fed.R.Civ.P. 56. For the reasons stated herein, Defendant's motion is GRANTED and Plaintiff's motion is DENIED.

### I.

The four remaining Plaintiffs[1] are Frank R. Lorello, Phillip Sanders, James W. Schumaker, and Kevin A. Tierney. The Defendant, United Transportation Union ("UTU"), is a labor organization and the certified collective bargaining representative for approximately fifteen hundred active members employed in the territories of the former C & O Railroad, which are now owned and operated by CSX Transportation ("CSX"). The Plaintiffs, who are CSX employees and UTU members, filed this action against the Defendant on February 7, 1992. Plaintiffs' claim arises from their participation in a voluntary transfer program ("transfer program" or "transfer agreement") proposed by CSX in February 1990 and implemented in March 1990. Plaintiffs aver that UTU breached its duty of fair representation with respect to the negotiation and implementation of such transfer program.

### II.

#### Facts

UTU members who work for CSX are divided into five districts. District 1 covers employees in the Richmond, Virginia area and has approximately 422 members. District 4 covers employees in parts of West Virginia and Kentucky and has approximately 986 members.

In February 1990, when CSX believed there would be a shortage of labor in Districts 1 and 2, CSX determined that it would propose a transfer agreement to the employees in Districts 4 and 5. Under the terms of the agreement, employees who elected to transfer would be accepted into the program

Dunlap's Motion to Dismiss with prejudice.

in the order of their seniority. The transfer agreement further provided, *inter alia*, that the transferring employees would be (a) given a $40,000 transfer allowance; (b) given a new seniority date in their new seniority district; (c) granted a leave of absence from their former seniority district; and (d) allowed to return to their former district with their seniority restored *only if* they were unable to hold a position in the district to which they had been transferred. However, because the proposed agreement contained a provision affecting the employees' seniority status, a collectively bargained right, CSX had to obtain the approval of UTU.

On February 23, 1990, H.S. Emerick, CSX's Senior Director of Labor Relations, sent a letter to UTU General Chairman, Virgil Elswick, requesting his consent to the provisions affecting seniority rights in the transfer agreement. Mr. Elswick carefully considered the ramifications of the provisions. After he was fully satisfied that the agreement (1) adequately advised the transferring members of the affect the transfer would have on their seniority status and (2) provided protection for the hundreds of UTU members in Districts 4 and 5 who chose not to transfer and who had less seniority than the participants in the program, Mr. Elswick approved the transfer agreement. Specifically, Mr. Elswick agreed to a provision whereby the transferring employees could return to their former district with their old seniority ranking intact *only if* they could not hold a position in their new district. This arrangement afforded the transferring employees greater rights than if they had simply transferred under the terms of the existing collective bargaining agreement. Under the existing agreement, the transferring employees would have had to relinquish their old seniority status forever.

As part of the application process, Plaintiffs and all of the other CSX employees who sought to participate in the transfer program signed a Transfer Release Form which restated the terms of the transfer agreement. Thirty-three employees applied to participate in the program. CSX accepted twenty-eight of these applicants, including each of the Plaintiffs. All four Plaintiffs transferred from District 4 to District 1 in Richmond, Virginia. Prior to participation in the transfer program, each of the Plaintiffs had a relatively high seniority status in District 4. However, they all fully understood the terms of the agreement, and UTU did not advise or encourage any of its members to accept or decline CSX's transfer offer.

Soon after Plaintiffs began working in District 1, other employees with more seniority than Plaintiffs unexpectedly bid on positions in District 1. At the same time, CSX's business declined significantly. Consequently, Plaintiffs were on the bottom of the seniority list and were not able to bid for the types of positions they desired.

In December 1990, the Plaintiffs were dissatisfied with the transfer and wanted to relocate back to their former districts, keep the $40,000 transfer allowance, and regain their former seniority dates. In an attempt to alleviate the problem, CSX made several other transfer offers to the transferred employees, but none were accepted by the Plaintiffs.

In January 1991, General Chairman Elswick attempted to negotiate an agreement with Mr. Emerick to allow the transferred employees to return to their former districts. The proposal which the parties agreed upon allowed a ten day window in which the transferred employees could decide to return to their former districts, keep the $40,000 transfer allowance, and regain their former seniority rankings.

As the UTU members in Districts 4 and 5 became aware of the proposed agreement, they contacted Mr. Elswick in protest of the proposal. Such an arrangement would not only have allowed the Plaintiffs to pocket the $40,000 and return to their former district with their seniority rankings intact, but it would have displaced the members in District 4 who had not transferred and had lower seniority than the Plaintiffs. After due consideration, which included weighing the interests of all the members of UTU, Mr. Elswick informed CSX that the UTU would not agree to the proposed modification of the transfer agreement.

Plaintiffs subsequently filed this action claiming that the UTU breached its duty of fair representation in the negotiation and implementation of the transfer agreement.

### III.

■ A union breaches its duty of fair representation only when its conduct toward a member of the bargaining unit is arbitrary, discriminatory, or in bad faith. *Air Line Pilots Ass'n, Int'l. v. O'Neill,* 499 U.S. 65, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991); *Vaca v. Sipes,* 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1967); *see also Sutton v. Weirton Steel,* 724 F.2d 406, 412 (4th Cir. 1983). The Supreme Court has described this standard as requiring a showing of "discrimination that is intentional, severe, and unrelated to legitimate union activities." *Amalgamated Ass'n. of Street, etc. v. Lockridge,* 403 U.S. 274, 301, 91 S.Ct. 1909, 1925, 29 L.Ed.2d 473 (1971); *see also Smith v. Local 7898, United Steelworkers of America,* 834 F.2d 93, 96 (4th Cir.1987). In *Air Line Pilots Ass'n.,* the Supreme Court held that a union breaches its duty of fair representation "only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness,' as to be irrational." *Air Line Pilots Ass'n.,* 499 U.S. at ——, 111 S.Ct. at 1130.

■ It is well recognized that as the exclusive representative for all of its members, "[w]hen the interests of members of the bargaining unit are not identical, a union may be unable to achieve complete satisfaction of everyone." *Smith,* 834 F.2d at 96. Indeed, "[t]he complete satisfaction of all who are represented is hardly to be expected. A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents." *Ford Motor Co. v. Huffman,* 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953); *see also Long v. Chesapeake & Ohio Ry.,* 42 Fair Empl.Prac.Cas. (BNA) 990, 993, 1986 WL 15503 (E.D.Va.1986). A union does not breach the duty of fair representation in taking "a good faith position contrary to that of some of the individuals it represents, nor in supporting the position of one group of employees against another." *Humphrey v. Moore,* 375 U.S. 335, 349, 84 S.Ct. 363, 371, 11 L.Ed.2d 370 (1964). As recognized by the Fourth Circuit, "[i]t is inevitable in the give-and-take of collective bargaining that some employees will fare worse than others. But a union may compromise to achieve long-term advantages, even though individual employees may be affected differently...." *Sutton,* 724 F.2d at 412.

### IV.

■ The Plaintiffs assert that UTU "intentionally, outrageously, arbitrarily, capriciously, and irrationally refused to enter into an agreement with CSX that would allow Plaintiffs to return to District 4 and exercise their seniority there." *Complaint* at ¶ 27. Additionally, Plaintiffs allege that UTU effectively prevented them from returning to District 4 with their seniority rankings intact by acting in bad faith. *Complaint* at ¶ 28. Nevertheless, the facts do not indicate that UTU's conduct was in any fashion arbitrary, discriminatory, or in bad faith.

The UTU was confronted with a difficult decision. It could have either (a) agreed to rescind the transfer agreements and allow the transferred employees to return to their former districts with their former seniority rankings intact, while displacing hundreds of employees with less seniority, or (b) held the transferred employees to the agreements that they knowingly and voluntarily entered into.

■ UTU not only had a right, but an obligation to maximize job opportunities for *all* of its members. *See Ekas v. Carling Nat'l Breweries, Inc.,* 602 F.2d 664 (4th Cir. 1979), *cert. denied,* 444 U.S. 1017, 100 S.Ct. 669, 62 L.Ed.2d 646 (1980); *Long v. Chesapeake & Ohio Ry.,* 42 Fair Empl.Prac.Cas. (BNA) 990, 1986 WL 15503 (E.D.Va.1986). Thus, the UTU properly weighed the interests of the employees in District 4, who did not accept the transfer agreement and would have been displaced by the Plaintiffs' return, against the interests of the transferred employees who voluntarily entered into the program. The UTU's decision not to rescind the transfer agreements was a reasonable

action that was based upon wholly relevant considerations. *See Humphrey v. Moore,* 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964). This decision can in no way be deemed "so far outside a 'wide range of reasonableness,' as to be irrational." *Air Line Pilots Ass'n,* 499 U.S. at 67, 111 S.Ct. at 1130.

Plaintiffs have not produced any evidence that the UTU acted in bad faith in its handling of the transfer program. In fact, all of the Plaintiffs concede that the union did not bear them any animosity or ill will. Moreover, the evidence indicates that the UTU was both responsive and honest in its handling of the transfer program.

In sum, Plaintiffs made an informed decision to participate in the transfer program. When the transfer did not work out as Plaintiffs anticipated, they sought to back out. The UTU carefully and appropriately weighed the competing interests of the members who remained in District 4 against the interests of the Plaintiffs and decided not to rescind the transfer agreements. UTU's conduct can in no way be deemed to be arbitrary, discriminatory, or in bad faith.

## V.

WHEREAS, there are no genuine issues of material fact, and the Court finds as a matter of law, that Defendant has not breached its duty of fair representation, Defendant's Motion for Summary Judgment is hereby GRANTED, and Plaintiffs' Cross Motion for Summary Judgment is DENIED.

An appropriate order will issue.